PATTERSON, Judge.
Appellant, Malcolm D. Burnett, was indicted in a fourteen-count indictment: the first six counts charged sodomy in the first degree, in violation of § 13A-6-63, Code of Alabama 1975; the next six counts charged sexual abuse in the first degree, in violation of § 13A-6-66; and the last two counts charged rape in the first degree, in violation of § 13A-6-61. Appellant entered pleas of not guilty and not guilty by reason of insanity. Prior to trial, a jury determined that appellant was competent to stand trial for the alleged offenses. Subsequently, appellant was tried before another jury, which convicted him of six counts of sodomy in the first degree (Counts I through VI), five counts of sexual abuse in the first degree (Counts VIII through XII), and one count of rape in the first degree (Count XIII). Regarding Count XIV, the jury found appellant not guilty of rape in the first degree, but found him guilty of attempted rape in the first degree. A judgment of acquittal was ordered by the court, on motion of appellant, as to one count of sexual abuse in the first degree (Count VII). The trial court sentenced appellant to life imprisonment on each conviction for sodomy in the first degree; ten years’ imprisonment on each conviction for sexual abuse in the first degree; life imprisonment on the conviction for rape in the first degree; and twenty years’ imprisonment on the conviction for attempted rape in the first degree. All sentences were ordered to run consecutively.
Appellant raises one issue on appeal. He does not question the sufficiency of the evidence to support his convictions; thus, we find it unnecessary to recite the facts in detail, and will only set out facts we deem necessary for an understanding of the issue raised. We have reviewed the evidence presented by the state and find that it was sufficient to support the jury’s verdicts.
The state’s evidence showed that appellant, who was over 60 years of age, picked up 6 young children after school and brought them to his residence, where he and his nephew, Lawrence C. Utley,[1] who was over 30 years of age, had them remove their clothing and caused the children to engage in various sexual acts with them and with each other. The children’s ages ranged from five to ten years. The two older children were girls approximately ten years old, and the remaining four younger children were boys. All the children were present, in a group, during the sexual activity and had to either observe or participate in the sexual acts.
Appellant testified in his own behalf. He acknowledged that he knew the children and that they were in his residence; however, he denied abusing or molesting them. On behalf of his alternative defense, he presented Dr. Daniel L. Koch, a psychologist, to support his plea of insanity. Dr. Koch gave his opinion that, due to a mental illness at the time of the alleged offenses, appellant lacked the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.
On rebuttal, the prosecution called Dr. Norman G. Poythress, Jr., a psychologist employed by the state, who sharply disagreed with the opinion of Dr. Koch. Dr. Poythress testified that his examination of *237 appellant did not disclose any mental illness or defect which would cause him to lack the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Rather, he opined that appellant was not suffering from a mental illness at the time of the commission of the alleged offenses. Dr. Poythress was also of the opinion that appellant understood the nature of the proceedings against him, was able to cooperate with his attorney, and was mentally competent to stand trial.
Appellant contends that the trial court erred to reversal in “admitting over timely objection evidence of a single prior act by defendant, during the state’s case in rebuttal.” An older sister of one of the female victims was called as a rebuttal witness by the state.[2] She was 15 years old, and she testified about an incident which involved her and appellant and which occurred approximately seven years prior to the time of the incident giving rise to the instant prosecution. Appellant’s counsel, anticipating this testimony, objected to her being called as a witness, on the ground that her testimony would involve an incident that was too remote to be admissible since it occurred seven years earlier. He argued that the prejudicial value of her testimony far outweighed any relevance or materiality that it might have. His objection was overruled, and the witness was permitted to testify. Her testimony, in pertinent part, is as follows:
“BY MR. HARRISON [prosecuting attorney]:
“Q. All right, ... state your full name for the record, please.
“A. S.J.T.
“Q. All right, S., how old are you?
“A. Fifteen.
“Q. Okay, and do you know K.T.?
“A. Yes, sir.
“Q. And J.T.?
“A. My little brother.
“Q. Okay, and do you know a Mr. Burnett?
“A. Yes, sir.
“Q. Okay, and how did you come to know Mr. Burnett?
“A. He used to live next door to us.
*238 “Q. Have you gone to Mr. Burnett’s house?
“A. Yes, sir.
“Q. [W]hen was that?
“A. About two years ago, a year.
“Q. Did you go to Mr. Burnett’s house when you were much younger?
“A. Yes, sir.
“Q. About how old were you?
“A. When I was eight.
“Q. ... Now, when you went to Mr. Burnett’s house at that time what, if anything, did you do?
“Q. S., look at me, S. Did Mr. Burnett ask you to do something?
“A. (Witness cries.)
“A. Yes, sir.
“Q. What did he ask you to do?
“A. (Witness cries.)
“Q. S., look at me. I’m going to try and help you if I can. S., did Mr. Burnett touch you?
“A. Yes, sir.
“Q. Where did he touch you, S.? S.? Where did he touch you? “DEFENDANT: Oh, darling, how can you do that?
“Q. S., where did he touch you?
“A. (Witness cries.)
“Q. S., where did he touch you?
“A. (Inaudible) my breast.
“Q. All right, did he touch you anywhere else?
“A. Yes, sir. (Witness cries.)
“Q. Where, S.? Where, S.?
“A. (Witness cries.)
“Q. Okay, S., let me ask you this. When Mr. Burnett touched you, did you have your clothes on or off?
“A. Off.
“Q. When Mr. Burnett touched you did he have his clothes on or off?
“A. Off.
“Q. ... S., do you recall whether or not Mr. Burnett had a dog?
“A. Yes, sir.
“Q. Do you recall the name of that dog?
“A. Sherry (phonetic).
“Q. ... Did Mr. Burnett do anything to that dog in your presence?
“A. Yes, sir.
“Q. What did he do?
“A. He choked him.
“Q. Did he kill the dog?
“A. Yes, sir.
“Q. ... Now, after that were you ever shown a photograph of that dog?
“A. Yes, sir.
“Q. When?
“A. He brought me a picture.
“Q. Did he say anything to you when he showed you that picture?
“A. No, cause he gave it to me when my mama was there.
“Q. ... Did he ever tell you anything about Sherry?
“A. Said if I didn’t do what he wanted he was (inaudible).
“THE COURT: Said if you didn’t do what he wanted that that’s what he was going to do to you, is that — is that what you said?
“WITNESS: Yes, sir.
“Q. Is that when he was touching on you?
“A. Yes, sir.
“Q. Okay, and how old were you at that time, S.?
“A. I was eight.
“Q. Eight, and how old are you now, S.?
“A. Fifteen.”
One of the victims had previously testified, in the state’s case-in-chief, that appellant had killed a cat in the presence of the children and had told them that he would do that to them if they ever told their mother.
*239 Appellant argues that the admission of the testimony of S.T. violated the general exclusionary rule prohibiting the introduction of evidence of crimes not charged in the indictment, which is stated as follows:
“On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question. This rule is generally applicable whether the other crime was committed before or after the one for which the defendant is presently being tried.
“This exclusionary rule is simply an application of the character rule which forbids the state to prove the accused’s bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.
“The foregoing exclusionary rule does not work to exclude evidence of all prior crimes, only such as are offered to show the defendant’s bad character. If the defendant’s commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than as tending to prove guilt via bad character, then proof of such other act is admissible.”
C. Gamble, McElroy’s Alabama Evidence § 69.01(1) (3d ed.1977) (footnotes omitted).
Under Alabama law, evidence of any offense other than that specifically charged is prima facie inadmissible. Allen v. State, 380 So.2d 313 (Ala.Cr.App.1979), cert, denied, 380 So.2d 341 (Ala.), cert. denied, 449 U.S. 842, 101 S.Ct. 121, 66 L.Ed. 2d 49 (1980). However, Alabama law provides for the admission of evidence of collateral crimes or acts as part of the prosecution’s case if the defendant’s collateral misconduct is relevant to show his guilt other than by suggesting that he is more likely to be guilty because of his past misdeeds. Brewer v. State, 440 So.2d 1155 (Ala.Cr.App.1983). Numerous Alabama cases list the exceptions to the general exclusionary rule, or tests for relevancy, where evidence of collateral crimes or acts may be admitted. These exceptions include the following:
“(1) Relevancy to prove physical capacity, skill, or means to commit the now-charged crime; (2) part of the res gestae or part of a continuous transaction; (3) relevancy to prove scienter or guilty knowledge; (4) relevancy to prove criminal intent; (5) relevancy to prove plan, design, scheme, or system; (6) relevancy to prove motive; (7) relevancy to prove identity; (8) relevancy to rebut special defenses; and (9) relevancy to various particular crimes.”
Nelson v. State, 511 So.2d 225, 233, (Ala. Cr.App.1986), aff’d, 511 So.2d 248 (Ala. 1987). See also Twilley v. State, 472 So.2d 1130 (Ala.Cr.App.1985); Brewer v. State, supra; Miller v. State, 405 So.2d 41 (Ala. Cr.App.1981); Thompson v. State, 374 So. 2d 377 (Ala.Cr.App.1978), aff'd, 374 So.2d 388 (Ala.1979); McMurtrey v. State, 37 Ala.App. 656, 74 So.2d 528 (1954); Wilkins v. State, 29 Ala.App. 349, 197 So. 75, cert. denied, 240 Ala. 52, 197 So. 81 (1940); McElroy’s, supra, §§ 69.01(1) — (11).
The attorney general contends that the testimony of S.T. was admissible under the intent and plan, design, scheme, or system exceptions to the general exclusionary rule. The attorney general also contends that her testimony was admissible for the. purpose of impeachment. He argues, in this regard, that it was proper to permit the testimony of the killing of the dog, since appellant had denied it
After considering the evidence presented both by the state and appellant, we conclude that the testimony of S.T. was admissible under the well-recognized exception to the general exclusionary rule that *240 testimony of a collateral crime or act may be admissible as being relevant to rebut special defenses. We find that the testimony was relevant to rebut appellant’s insanity defense. We find in McElroy’s, § 69.01(10), the following:
“If an accused, pleading not guilty by reason of insanity, introduces evidence warranting a finding of the truth of such plea, the state may prove his commission of other crimes as tending to show that he was not demented and that his commission of the now-charged crime was the offspring of a wicked propensity, rather than a diseased mind. Allowing the proof of such prior crimes is generally justified upon the basis of the rule that, in a plea of insanity, the prosecution can operate under the wide latitude theory in bringing out all the acts and declarations of the defendant. The only limiting factor upon this rule is the holding that the acts, declarations and conduct of the accused inquired about must have a tendency to shed light on his state of mind when the act for which he is being tried was committed.” (Footnotes omitted, emphasis in original.)
For several cases recognizing this limitation, see Ex parte Miller, 460 So.2d 228 (Ala.1984); Nichols v. State, 276 Ala. 209, 160 So.2d 619 (1964); Barbour v. State, 262 Ala. 297, 78 So.2d 828 (1954). We also find in McElroy’s, § 61.01(7):
“The courts have adhered to the wide latitude rule relating to the admissibility of the conduct and condition of a criminally accused offered in support of his plea of insanity. This wide latitude has encompassed many forms of conduct and conditions which the trial courts have held are relevant to show his mental incapacity at the time in issue. This same wide latitude has been exercised in the decisions relating to the admissibility of the conduct and condition of the accused offered by the state in opposition to the accused’s plea of insanity.” (Footnotes omitted.)
See, e.g., Watts v. State, 282 Ala. 245, 210 So.2d 805 (1968); Nichols v. State, supra; Grammer v. State, 239 Ala. 633, 196 So. 268 (1940).
“Evidence of the prosecution tending to rebut a defense will not be excluded because it also tends to show the commission of another crime by the accused. Thus, ... where the accused asserted the defense of insanity, evidence which tended to show that he was sane was admissible even though it also tended to show that he was guilty of another crime.”
Wharton’s Criminal Evidence § 258 (C. Torcia 13th ed. 1972) (footnote omitted).
Clearly, appellant’s prior acts, as revealed in S.T.'s testimony, have a tendency to shed light on his state of mind when the acts for which he was being tried were committed. Appellant attempted to establish his insanity claim through the testimony of Dr. Koch, a psychologist, who commenced his examination of appellant on August 8,1985, approximately nine months prior to the trial and approximately ten months after the occurrence in December 1984 of the acts charged in the indictment. Dr. Koch testified that, in his opinion, appellant was “mentally ill” at the time of the commission of the acts charged and was suffering from “senile dementia,” which he defined as “an organic deterioration of the brain which impairs him globally in thinking skills.” Dr. Koch also testified that appellant began having problems in 1978, when his wife divorced him. He said that he began, at that time, to drink heavily and that, over a period of years, the abuse of alcohol played a role in his condition. He further explained that appellant’s alcohol abuse took several years to affect his brain and that he would have shown some “deficits” in 1980, 1981, and 1982. Dr. Koch testified that appellant’s mental condition at the time of the alleged offenses, “senile dementia,” had existed or had been “onset” for eighteen months or two years prior to his diagnosis. He characterized appellant’s problem prior to the onset of “senile dementia” as “emotional problems.”
Appellant’s claim of insanity was rebutted by Dr. Poythress, who specifically testified that appellant had exhibited no symptoms of psychiatric disorders prior to October 1984, and that he found no disorder at the time of the alleged offenses which *241 would have impaired appellant’s ability to conform his conduct to the law. He concluded that the only thing he observed was a slight memory loss in the last couple of years.
In examining the evidence of insanity presented by appellant’s expert witness in a light most favorable to appellant, we must conclude that appellant’s mental condition which would relieve him of responsibility for his acts came into being no earlier than two years before the diagnosis. This would have been sometime around August 1983. Based on appellant’s own expert witness’s testimony, appellant did not even show signs of deterioration until 1980. Since the evidence supports the legal presumption that appellant was sane in 1978 when he committed the acts to S.T., the testimony concerning those acts was relevant to rebut appellant’s contention that the presently charged crimes sprang from a disease of his mind. The testimony that appellant committed almost identical acts with S.T., prior to the time of the commission of the acts presently charged and when he was sane, substantially impairs the hypothesis that a diseased mind caused the present acts. Not only did the prior incident clearly bear upon the issue of appellant’s sanity, but its probative value, in fact, warranted its admission despite the potential for prejudice. McElroy, Relevancy of Evidence in Alabama Upon an Issue of a Person’s Mental Capacity, 4 Ala.Law. 384 (1943). In finding that the relevance of S.T.’s testimony clearly outweighed its prejudicial effect and, thus, was properly presented to the jury, we have reviewed the following cases wherein the lower court was reversed for having admitted testimony of the defendant’s prior bad acts upon the appellate court’s finding that such testimony was irrelevant to the mental capacity of the defendant at the time in issue: Ex parte Miller, supra; Watts v. State, 282 Ala. 245, 210 So.2d 805 (1968); Peoples v. State, 257 Ala. 295, 58 So.2d 599 (1952); Coffey v. State, 244 Ala. 514, 14 So.2d 122 (1943); Pilkington v. State, 46 Ala.App. 716, 248 So.2d 755 (1971), cert. denied, 287 Ala. 739, 248 So.2d 757 (Ala.1971); Thomason v. State, 46 Ala.App. 10, 237 So.2d 121 (1970). Upon our review, we find these cases to be factually distinguishable from the case at bar and, thus, not controlling.
For the above stated reasons, the judgment of the court below is due to be, and it is hereby, affirmed.
AFFIRMED.
All Judges concur.

. Lawrence W. Utley was convicted for sodomy, sexual abuse, and attempted rape, on charges arising out of the same incident. His case was affirmed on appeal. Utley v. State, 508 So.2d 287 (Ala.Cr.App. 1986).

. The name of the older sister, S.T., was first mentioned, in the trial, during the cross-examination of appellant. Appellant himself injected her name into the trial. His testimony in this regard is, as follows:
"Q. You knew all six of the children?
"A. Yes, sir.
"Q. ... Had them out to your house?
"A. Well, I did, yes.
"Q. ... Did you get along okay with them? “A. I had no trouble whatsoever with them. "Q. ... Did they have any trouble with you? "A. No, sir.
"Q. So, they had no reason to lie about you? "A. Well, I said something to the oldest girl that I shouldn’t have said. I had got hurt the day before. I took her out. The oldest T. girl, I had said something that I shouldn’t have said and I don’t know what it was.
"Q. Was that S. or K.?
"A. This is what started it and it was called enticement and that's why the man beat me to death nearly.
"Q. Okay, is that S.T.?
“A. Yes, sir.
"Q. ... How long have you known S.T.? "A. I don’t know. Must be 15 years, 12 years anyway.
"Q. ... Had she ever been out to your house?
"A. Yes, sir.
"Q. ... Did you ever have a puppy dog?
"A. A dog, yes. I had a dog, yes.
"Q. What was that dog’s name?
"A. Sharee (phonetic).
”Q. Okay, what happened to Sharee?
"A. She died with a heart attack.
"Q. ... You didn’t kill Sharee? You didn’t kill that dog?
"A. No, I didn’t kill her. Why?.
"Q. Didn’t do that. Okay. Did you get along okay with S.?
“A. I never had no problem with her at all. "Q. All right. So, she wouldn’t have any reason to lie about you either?
“A. Well, I don’t know.
"Q. Well, would she have a reason to lie about you?
“A. I don’t know. The little thing fell in love with me one time and I had to drop her because she was young, a child, and I had her down her at the ...
"THE COURT: Hold on just a minute.
“A. ... hall assembly and a colored lady told me that the little thing was in love with me and I dropped her. I had to.
"(Off the record interruption.)
"Q. She fell in love with you?
“A. A colored lady told me that she fell in love with me and I carried her home and I told her mother about the lady. I carried her out [a] few times and — .’’